IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SCOTT PHILLIP LEWIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:21-CV-74 |
| | § | |
| WILLIAMSON COUNTY, TEXAS, | § | |
| | § | |
| Defendant. | | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Scott Phillip Lewis, files this 40 U. S. C. § 1983 and Americans with Disabilities Act lawsuit against Defendant, Williamson County, Texas, and would in support thereof respectfully show the Court as follows:

### A. PARTIES

1. Plaintiff, Scott Phillip Lewis, is an individual that is a citizen on the State of Texas.

2. Defendant, Williamson County, Texas, is a county in the State of Texas and may be served through its County Judge, Bill Gravell, Jr., at 710 S. Main St., #101, Georgetown, Texas. Service is requested contemporaneously with the filing of this complaint. The policymaker for the Williamson County Sheriff's Department was elected Sheriff, Robert Chody, who was an agent and employee of Williamson County, Texas.

### B. JURISDICTION

3. This Court has jurisdiction over the lawsuit because the suit arises under 42 U.S.C. § 1983 and the American with Disabilities Act, pursuant to 28 U.S.C. § 1331.

## C. VENUE

4. Venue is proper in this district under 28 U.S.C. § 1391(b) because Williamson County, Texas, is situated in this district and because a substantial part of the events or omissions giving rise to this claim occurred in this district.

## D. CONDITIONS PRECEDENT

5. All conditions precedent have been performed or have occurred.

## E. FACTS

6. On or about January 25, 2019, after being arrested in humiliating fashion on national television, Plaintiff was taken into custody by the Williamson County Sheriff's Department, and he suffered a broken shoulder while in their custody due to the policies, procedures and culture of the Sheriff's Department.  His should remains injured and he has restricted range of motion and ongoing pain as result of his broken shoulder.

7. Prior to being arrested, Plaintiff was detained for a prolonged period of time to ensure camera crews of the television show, "Live PD," could arrive on the scene to record and broadcast. Plaintiff was transported to a different location after being initially pulled over in his vehicle to ensure a more suitable filming environment for the television show.  The show is not broadcast live and there is editorial control by Sheriff Chody where he has authority to "pull" a segment from being broadcast.

8. In 2018, Williamson County's elected sheriff, Sheriff Chody, was the policy maker for the Williamson County Sheriff's Department.  Sheriff Chody, entered into a contract for the filming of "Live PD," a national television program that purports to show live footage of police authorities throughout the country.  This contract was originally unanimously approved by the

Williamson County Commissioner's Court, the governing body of Williamson County, Texas.

9. Live PD capitalizes on commercializing serious criminal justice matters into television spectacle. Sheriff Chody created a culture around the show that rewarded the escalation of conflict and violence. The Sheriff's Office runs the Williamson County Jail, where Plaintiff's injuries occurred, and the injuries were a direct result of this culture.

10. Sheriff Chody regularly promoted "Live PD" on social media.  He has written that the show is related to accomplishment of his office's core duties.   He regularly tweeted and otherwise promoted the show, and he encouraged and incentivized his officers to create more entertaining television in furtherance of heightened spectacle and better television ratings.   If an officer's interaction with criminal suspects was routine, it was less likely to be broadcast

11. For example, Plaintiff was detained additional lengths of time to ensure he was broadcast on national television, and the arresting officer featured on Live PD repeatedly pointed out that during the ordeal Plaintiff urinated on himself.  Plaintiff told multiple officers of his mental health issues including anxiety, and later that day at the Williamson County Jail after experiencing a panic attack he was assaulted by officers at the jail and physically restrained, resulting in a broken shoulder.  The manner in which Plaintiff was restrained was unlawful and a result of the culture at the Sheriff's Department that encouraged escalation of conflict and unnecessary use of physical force.

12. Additional examples of commercializing the Williamson County Sheriff's Department for furtherance of unnecessary escalation of conflict (for better television ratings and a general behavior pattern of domination to anyone they perceived as inferior) include the following: "Live

3

PD" camera crews and the Williamson County Sheriff's Department physically broke down a door to effectuate a warrant for arrest, despite the fact that person was at the Williamson County Courthouse the same day; rather than a routine arrest with no television spectacle, a violent interaction was created.

13. For further example, when executing a warrant for a non-violent suspect related to a minor drug offense, a SWAT team was sent and executed a "no-knock warrant" with the use of flash bang grenades and military gear where a front door was broken and television spectacle created. This occurred despite the fact that the suspect could have been arrested without incident earlier in the day when there were no "Live PD" television crews present.

14. For further example, another criminal suspect died after a high speed chase due to the suspect not dimming his headlights.  This minor traffic offense was turned into television spectacle though an unnecessary police chase that turned deadly after the suspect surrendered to authorities and despite informing them of his health conditions was repeatedly tased and ultimately died as a result thereof.  Additional examples of excessive force include another suspect who died in June of 2019 after being repeatedly tased and filmed by "Live PD."  In none of these cases were the officers disciplined, and Sheriff Chody never used his authority to prevent any of the footage from being aired.

15. In all of these examples, the television footage after being aired was destroyed by "Live PD," despite constituting directly relevant evidence to criminal allegations and subsequent civil suits. Nevertheless, Sheriff Chody's repeated tweeted that "Live PD" improved policing despite this ongoing destruction of evidence and the encouragement of escalation of conflict and unnecessary physical confrontation.   Williamson County District Attorney Shawn Dick stated, "[T]he

Sheriff's Office has a responsibility and a duty to get us all the evidence in a case. . . . whoever they let into a crime scene, we better have the names of those witnesses and the evidence that they can provide. . ..   [For over two years], we've never gotten that kind of information."  This has resulted in certain offenses not being charged due to destruction of evidence.

16. Sheriff Chody created a policy and practice within the department that incentivized violence and looked the other way regarding alleged violations of civil rights.  Not only were officers rewarded for the use of violence, but allegations of unnecessary violence were not investigated or punished.  Plaintiff in this case made two formal requests for an inquiry into the events that caused his broken shoulder, but no investigation occurred. Separately, but relatedly, Sheriff Chody praised officers even after the death of a criminal suspect after an unnecessary police chase for a minor traffic incident and excessive force thereafter: "You're doing extremely good . . . I just wanted to say . . . how proud I am of [the officers], but of all the troops that are on Live PD."

17. Officers working for Sheriff Chody demonstrably understood the policy and culture of creating television spectacle and generally promoting escalation of conflict and physical confrontation.  One employee tweeted after being featured on "Live PD," that he was "[g]lad we could make some good TV for the boss man," and he also tweeted, "Gonna try to get some good stuff stirred up for y'all tonight."

18. Sheriff Chody encouraged officers to use excessive force, especially for suspects on "Live PD."  The policy and culture rewarded "good TV" and it was understood by all who served under Sheriff Chody.  Sheriff Chody authorized awarding the title, "WilCo Badass" to officers who used physical force or violence; this practice encouraged officers to use force more

frequently to be in the good graces of Sheriff Chody.  Indeed, upon information and belief, only one officer was terminated after using excessive force during Sheriff Chody's tenure, and that officer claimed that he though his use of force would have earned him a gift card rather than a requested resignation.

19. In August of 2019, the Williamson County Commissioner's Court, the governing body of Williamson County, directed Sheriff Chody to cease allowing "Live PD" to film the show in Williamson County, and Sheriff Chody promptly ignored this directive claiming it was his exclusive perview.  The show continued to film in Williamson County.

20. In May of 2020, the Williamson County Commissioner's Court filed a lawsuit alleging that "Sheriff Chody can perform the core duties of sheriff without the live TV show. . . .   Sheriff Chody seeks social media and TV exposure like a moth to a light bult – and he's flown out of his job description to get back on TV."  The lawsuit alleged that "Live PD" jeopardized the safety of the citizens of Williamson County because it prioritized television "ratings over safety and proper police work."

21. Sheriff Chody changed the department's policy regarding background checks for all potential deputies, and instead offenses that previously would have disqualified applicants were overlooked.  This policy was criticized by former employees.  Sheriff Chody hired unqualified deputies and approved polies and practices that made for television spectacle at the expense of the safety of citizens.  At the time of Plaintiff's injuries from excessive force, the "Live PD" contract was approved by both Sheriff Chody and the Williamson County Commissioner's Court.  While the citizens of Williamson County voted Sheriff Chody out of office in November of 2020 (despite his allegations of a rigged election), the Commissioner's Court never sought to

remove Sheriff Chody from office despite knowledge of his ongling policy of violating the constitutional rights of the county's residents.

22. Prior to being the Sheriff of Williamson County, Sheriff Chody had a history of using excessive force himself.  In 1998, when he was a police officer, he used excessive force against a fifteen year old.  The fifteen year old was put in a choke hold and pinned against a vehicle by Chody until the child suffered seizures.  The hold was not released during this episode and the epileptic seizures became worse, and the City of Austin subsequently paid the victim a $30,000 settlement.  Sheriff Chody maintains that he was a "good cop" on the day of this incident.

23. This policy of unnecessary escalation of conflict resulted in the use of force incidents doubling from the year before "Live PD" and in 2019.  Use of force was especially likely for any suspect recorded on Live PD, and steps were taken to create "good TV" by humiliating and dominating suspects.  This culture and policy and practice permeated the sheriff's department, resulting in increased likelihood of unnecessary physical escalation of police matters; this culture made a criminal suspect with a mental health disorder at increased risk for mistreatment and it resulted in physical injury in this case where Plaintiff was subjected to excessive force resulting in physical and likely permanent injury to his shoulder.  Training of the department's staff was insufficient regarding de-escalation and other mechanisms to deal with criminal suspects who suffer from a mental health disorder, including but not limited to anxiety or dealing with a suspect having a panic attack.

24. Sheriff Chody created a policy that prioritized television ratings, promoted violence and unnecessary escalation of conflict.  There was a culture of disregard to criminal suspects with mental health issues and the mechanisms available to de-escalate or prevent the escalation of

physical violence or excessive force.

25. In 2017, Williamson County changed the academic standards of its training academy to lower the amount of training.  On information and belief, deputies assigned to work in the Williamson County Jail received insufficient training, and this resulted in the use of excessive force for Plaintiff and other criminal suspects.

26. The night of his encounter with "Live PD" and the Williamson County Sheriff's Department, Plaintiff was especially nervous because he was being followed by a civilian who Plaintiff perceived was following him, and though his anxiety would have normally been escalated after being pulled over by the police, he was made especially anxious after being detained to then perform a sobriety test on national television.  During his encounter, Plaintiff perceived the officers and film crew to be attempting to escalate the matter or provoke him.  None of this was aired on the show, and all of the footage that would corroborate his version of events was destroyed.

27. As a result of being ridiculed on the show, Plaintiff suffered significant harm including the loss of his employment and significant emotional distress.  As a result of having his shoulder broken, Plaintiff suffered significant harm.  The injury occurred when he began banging on the wall of his cell because of the anxiety he was suffering having learned that he was broadcast on national television that night; a group of officers gathered around his cell and one came in using excessive force that caused significant physical injury to Plaintiff.  Plaintiff was pinned by the officer in a way that caused his injury and this injury would have been avoided but for the polices of the department and the lack of training and the general toxic masculinity that permeated the department under Sheriff Chody's leadership. Plaintiff had previously disclosed

he was suffering from mental health issues to officers that evening upon his detention.

28. Plaintiff subsequently attempted to file an internal complaint within the Williamson County Sheriff's Department on multiple occasions.  He traveled to the Williamson County Jail to make a complaint and request an investigation, but the sheriff's department has no written record reflecting his complaint or request despite the fact that he made the complaint and request.

29. After filing his second request and complaint, Plaintiff was informed of the resolution of his request for investigation and complaint: a one page document simply stating "False/Not true." Despite Plaintiff's subsequent attempts to request an investigation into the incidents giving rise his shoulder injury, no investigation occurred.  This is also true regarding his allegations that he was detained for a prolonged period of time prior to being filed by "Live PD" to give the crew time to get there and of his mistreatment thereafter.

30. After being released, Plaintiff sought medical attention when the pain in his shoulder would not abate.  Plaintiff had a previous injury to his shoulder that was injured.  However, after being diagnosed with a broken shoulder he was directed to continue physical therapy but unfortunately the shoulder remains injured and has limited range of motion and significant pain as a result of the excessive force he suffered caused by above-described policies (and lack of policies and proper training).

### F. COUNT 1— FOURTH AMENDMENT § 1983 MONELL CLAIM

31. Plaintiff incorporates by reference all of the foregoing and further allege as follows:

32. The conduct described in this Count constitutes excessive force in violation of the Fourth Amendment of the United States Constitution, as incorporated in the Fourteenth Amendment.

33. At all times relevant to this lawsuit, the officers wore their official department uniforms and were acting within the course and scope of their duties as officers within the Williamson County Sheriff's Department.  Sheriff Chody was the lead of the department and was the policymaker for all matters related to the activities of the Williamson County Sheriff's Department.

34. Williamson County ratified or had in existence the following policies and practices in place: humiliation of suspects on "Live PD" was encouraged; escalation of physical and unnecessary violence was encouraged and incentivized; excessive force was rewarded; training was inadequate for de-escalation of force; hiring unqualified officers and failing to punish bad behavior or to train how to deal with citizens experiencing a panic attack or otherwise suffering from a mental health disorder.

35. Williamson County, including Sheriff Chody, took no action to investigate the claims made by Plaintiff, and to the extent that there was one it was insufficient and practically non-existent. Defendant violated Plaintiff's constitutional rights by failing to supervise, incentivizing excessive force, failing to train, resulted in excessive force suffered by Plaintiff, which violates his constitutional rights.  Sheriff Chody was deliberately indifferent to the known and obvious consequences of these polices, practices and customs.   Williamson County was aware of, authorized and encouraged these polices at the time of Plaintiff's injuries.  Sheriff Chody was actually aware of the facts from which any reasonable policymaker could draw the inference that a substantial risk of serious harm existed.   He knew of that risk but did not care because he valued fame and twitter followers more than the constitutional rights of the citizens of Williamson County.   Sheriff Chody was aware of the policies and promotion of the use of excessive force and unnecessary escalation involving physical confrontation and all other

allegations herein because he sought them and designed them.  It was apparent that these policies constituted obvious and apparent constitutional violations, and that these results were highly predictable as a result of Williamson County's policies.

36. Each described policy described herein was actually known, constructively known or otherwise acknowledged by Williamson County.  Its chief policy maker for the sheriff's department was Sheriff Chody.  These policies were drafted with deliberate indifference to Plaintiff's constitutional rights.  The known and obvious consequence of these polices is that ongoing violations of constitutional rights would be regularly repeated and encouraged to be repeated. The violations alleged herein were highly predictable as a consequence of these policies, which were a cause of the constitutional injuries and deprivations alleged herein, resulting in significant physical and emotional harm to Plaintiff, including but not limited to a broken shoulder and ongoing pain associated therewith.

### G. COUNT 2—AMERICANS WITH DISABILITIES ACT CLAIM

37. Plaintiff incorporates by reference all of the foregoing and further allege as follows:

38. The American with Disabilities Act provides, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity." 42 U.S.C. § 12132.  The Act requires Williamson County to reasonably accommodate people with disabilities or who are otherwise qualified.  Plaintiff's anxiety and depression and related mental health disorders constitute significant limits to cognitive thinking and concentration that are covered by the Act.

39. Williamson County violated Title II of the Act by refraining from using physical force and excessive force after Plaintiff identified his mental health issues.

## H. DAMAGES

40. Plaintiff incorporates by reference all of the foregoing and further allege as follows: The acts and omissions of Williamson County were the moving force causing Plaintiff's injuries.  Plaintiff seeks compensatory damages related to his injuries suffered at the hands of Williamson County. Defendants conduct was motivated by evil motive or intent or otherwise involved reckless or callous indifference to the protected rights of Plaintiff and therefore Plaintiff seeks punitive damages.   As a direct and proximate result of defendant's conduct, plaintiff suffered the following injuries and damages:

      a. Medical expenses in the past and future.

      b. Physical pain and mental anguish in the past and future.

      c. Lost earnings.

      d. Loss of earning capacity.

## I. ATTORNEY FEES & COSTS

41. Plaintiff is entitled to an award of attorney fees and costs under 42 U.S.C. § 12205 and 29 U.S.C. § 784a, 42 U.S.C. § 1988, and as otherwise allowable by law.

## J. JURY DEMAND

42. Plaintiff asserts his rights under the Seventh Amendment of the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## K. PRAYER

42. For these reasons, plaintiff asks for judgment against defendant for the following:

    a. Actual, compensatory, and punitive damages;

    b. Prejudgment and postjudgment interest;

    c. Reasonable and necessary attorney's fees and expenses including expert fees;

    d. Costs of suit.

    e. All other relief the Court deems appropriate.

RESPECTFULLY SUBMITTED,

OSBORN LAW FIRM, P.C.

By: /s/Chris Osborn
    Christopher D. Osborn
    State Bar No. 24037221
    2403 N. Main Street
    Taylor, Texas 76574
    512-275-6593
    512-309-5317 fax
    chris@osbornpc.com

ATTORNEY FOR SCOTT PHILLIP LEWIS