# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS

## AUSTIN DIVISION

| | | |
|---|---|---|
| **SCOTT PHILLIP LEWIS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 1:21-CV-00074** |
| **v.** | § | |
| | § | |
| **WILLIAMSON COUNTY, TEXAS,** | § | |
| | § | |
| **Defendant.** | | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COMES PLAINTIFF, Scott Phillip Lewis, and files *SECOND AMENDED COMPLAINT.* Plaintiff files **42 U.S.C § 1983**; **Americans with Disabilities Act; and Rehabilitation Act** lawsuit for cause of action will show the following.

### I.   PARTIES

1.   Plaintiff is Scott Phillip Lewis ("Plaintiff") an individual and a citizen of the United States.

2.   The Defendant, Williamson County, Texas ("Defendant"), is a county in the State of Texas and may be served through its County Judge, Bill Gravell, Jr., at 710 S. Main St., #101, Georgetown, Texas.  Service is requested contemporaneously with the filing of this complaint.

## I.      JURDISDICTION AND VENUE

3.    The court has jurisdiction over this lawsuit according to 28 U.S.C. § 1331.  The court has personal jurisdiction over Williamson County because it is a Texas county.

4.    Venue is proper in the Austin Division of the United States District Court for the Western District of Texas, under 28 U.S.C. § 1391(b).  Williamson County, Texas, is situated in this district and a substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Williamson County, Texas.

## II.      FACTUAL ALLEGATIONS

### A. Introduction

5.    Plaintiff prepares the factual allegations sections below as the general substance of factual allegations.  Plaintiff is pleading that this amended complaint and previous complaints have specified factual allegations that have evidentiary support, or will likely have evidentiary support after a reasonable opportunity for further investigation and discovery.  Plaintiff does not intend that those sections below provide chronological order of allegations.  Instead, Plaintiff aims to provide Defendants adequate fair notice of the general nature and substance of the allegations and claims, in addition to demonstrate that the allegations and claims have facial plausibility.

### B. Plaintiff's "LivePD" Arrest

6.    On January 25, 2019, after having being arrested in Williamson County, Texas, Plaintiff was taken into custody by the Williamson County Sheriff's Department where he suffered subsequently physical and mental injuries.  While Plaintiff was unaware as a pretrial detainee, Williamson County officials were working closely with a television show "LivePD" to

selectively edit portions of his arrest for the opening scene of that night's broadcast.

7.      "LivePD" was a television show that capitalized on exploiting serious criminal justice matters into television spectacle. If an officer's interaction with criminal suspects was routine it was less likely to be broadcast.  Those susceptible of mental health symptoms, such as Plaintiff, were more vulnerable for mistreatment on the show.

8.      The night of Plaintiff's encounter with "LivePD" and the Williamson County Sheriff's Department, Plaintiff was especially excitable because he was being followed by a civilian vehicle, for more than 18 minutes, who Plaintiff perceived was following him and a potential threat.

9.      Though pre-existing mental health symptoms would have normally been escalated after being pulled over by the police, he was made especially anxious after a high speed chase with a civilian, being detained and then performing a field sobriety test with a camera on the scene of a different location than the initial traffic stop. During his encounter, Plaintiff perceived the officers and film crew to be attempting to escalate the matter or provoke him.

10.      Prior to being arrested, Plaintiff was detained for a prolonged period of time to ensure camera crews for "LivePD" to arrive on the scene to record.  Plaintiff was transported to a different location after being initially pulled over in his vehicle to ensure a more suitable filming environment for the television show.

11.      Lt. Grayson Kennedy was not an officer at the initial location, proceeded to repeatedly point out that Plaintiff urinated on himself after the completion of the filmed field sobriety test.  In fact, the filming location, not the initial stop, is where Lt. Grayson Kennedy arrived with a "LivePD" camera crew.  Plaintiff was subjected to what he perceived as intentional attempts by Lt. Grayson Kennedy at humiliation, provocation, and escalation of

conflict, exacerbating anxieties in Plaintiff.

12.     The interaction between Plaintiff and Lt. Kennedy ended with Plaintiff being

pushed into the side of the police vehicle after Plaintiff asked the officer his name.

Plaintiff never gave his consent to being filmed or having his name, image or likeness published

for the television show prior to being transported to the Williamson County Jail.

### C. PLAINTIFF'S BOOKING INTO WILLIAMSON COUNTY JAIL AND SUBSEQUENT INJURIES

13.     Upon being booked into the Williamson County Jail, Plaintiff was  asked medical

questions prior to the physical and mental injuries sustained.  Plaintiff provided  details of

current mental health symptoms and mental health history.  Jail staff and/or officers were aware

made aware of Plaintiff's physical and mental conditions and limitations.

14.     Plaintiff's injury occurred after learning his arrest was broadcast on the television

show "LivePD" without his consent. Plaintiff immediately experienced an intense increase in

mental health symptoms leading to a panic attack or manic episode.  Plaintiff banged on the

windows while suffering a debilitating increase in mental health symptoms from learning of the

broadcast.

15.     A group of officers gathered around his cell.  One officer entered the cell using

excessive force by using a takedown tactic.  A "full nelson"  was used where the officer's knee

in was in Plaintiff's back forcing Plaintiff's left rib into a concrete step while Plaintiff's arms

being simultaneously pulled backwards with pressure applied to the neck area.  Plaintiff was

strapped to an emergency restraint chair by having his wrists and ankles tied.

16.     Initially, Plaintiff was unattended for a period of time with mental health

symptoms flaring.  When Plaintiff asked to use the restroom, he was advised to go in the chair he

was strapped to and that there was a drain underneath him. When Plaintiff complained that his shoulder was in pain, the straps were tightened over his injured shoulder that occurred from the takedown.

17.     Plaintiff was denied adequate medical care and accommodations.  After getting out of the immobilized chair, Plaintiff did not receive treatment for his injured shoulder. Plaintiff was assigned a top bunk and was told to make the bed. Plaintiff did so, climbing up while in excruciating pain; his arm limp and hanging, in clear sight of Williamson County Jail employees.

18.     The use of the emergency restraint chair is known to be dangerous and can cause serious and permanent injury; and must be closely monitored and used with caution and was used improperly on Plaintiff.  Upon information and belief, the website for the company that sold the restraint chairs to Williamson County specifically warns that "detainees should not be left for more than two hours and that the chair "should never be used as means of punishment."

19.     Previous policies and customs that were in place to provide reasonable and expected medical care for mental health episodes were replaced by then Sheriff Chody's ("Chody") alternative method; a culture of encouraging and incentivizing excessive force and using the restraint chair unconstitutionally.  When Plaintiff suffered an anxiety attack, he was not provided with the medical care required by law, but instead met with punishment, force, and restraint exasperating pre-existing mental health conditions, and inflicting intentional emotional distress and physical pain.

### D.     Plaintiff's Mental Health History

20.     In November 2015, while Plaintiff was a passenger in an operational "golf cart taxi" service in which a golf cart styled vehicle transported individuals in and around downtown

Austin, TX.  As a passenger in the front of the golf cart, a hit and run accident involving a vehicle caused Plaintiff to suffer a concussion, or traumatic brain injury ("TBI") by the impact of his head crashing into the glass windshield of the golf cart from the collision.

21.     Despite being initially treated for the concussion, symptoms remained and progressively escalated over time and have endured.  A police report was filed that night. Despite Plaintiff's multiple attempts to acquire more information on the subsequent investigation, no follow up was returned.  Increased symptoms of anxiety and post-traumatic stress disorder were a result.

22.     Plaintiff entered an inpatient rehabilitation program in August 2018; at **A Forever Recovery** in Battle Creek, Michigan, to treat increasing symptoms of post-traumatic stress disorder and anxiety disorders, and separately an increasing physical dependence on alcohol. Plaintiff was granted *Family and Medical Leave Act* ("FMLA") leave to address his mental health symptoms.  Plaintiff made jail staff and/or officials aware of these medical conditions and medical limitations, and his mental health history that substantially limited one or more of his major life activities, otherwise Americans with Disabilities Act qualifications.

## E. EVENTS AFTER PLAINTIFF LEAVING WILLIAMSON COUNTY JAIL

23.     Plaintiff attempted to file an internal complaint within the Williamson County Sheriff's Department on or around March 5, 2019.  Plaintiff went to the Williamson County Jail to make a complaint and request an investigation, however the Sheriff's department has no written record reflecting his complaint.  Plaintiff spoke directly with two Williamson County officers in the Sheriff's Department that day and delivered a hand written complaint form that was provided by staff within an hour earlier.  Many follow up phone calls placed by Plaintiff

regarding the status of the complaint went without answer. Despite the fact that he made the complaint, evidence of Plaintiff's March 2019 complaint had disappeared.

24.     Plaintiff filed a second request and complaint during or around July 2019. Plaintiff was informed of the resolution of his second request for investigation and complaint; a one page document simply stating "False/Not true."  If Williamson County, including Robert Chody, took any action to investigate the two claims made by Plaintiff, it was not only insufficient but seemingly non-existent.

25.     On or around August 25, 2021, Plaintiff filed a Motion to Dismiss in Williamson County Court #2 related to material evidence missing based off the destruction of "LivePD" evidence, which was denied.  On April 25, 2022, criminal charges from Plaintiff's 'LivePD' arrest were dismissed by the State of Texas during Jury Trial for insufficient evidence after more than three years had passed from the from date of arrest.

**F.  History of Policy, Practice and Customs of Excessive Force In Williamson County**

26.     Prior to being the Sheriff of Williamson County, Robert Chody had a history of using excessive force himself.  In 1998, when he was a police officer for the Austin Police Department, he used excessive force against a fifteen year old named **Marcus Frank.**  Chody allegedly put the teenager in a "full nelson", an immobilizing, forceful tactic that places pressure on the neck, after slamming Frank's face on the hood of a car, until Frank suffered a seizure. The hold was not released during this episode and the epileptic seizures came worse.  This episode resulted in the City of Austin subsequently paying Frank, a $30,000 settlement.  Robert Chody has maintained that he was a "good cop" on the day of this incident.

27.     Chody hired unqualified or previously disciplined deputies to fill roles, even changing the department's policy regarding background checks for all potential deputies.  Past offenses that would previously disqualified a Sheriff's Office applicant were overlooked and often hired and/or promoted under Chody.

28.     Chody authorized awarding the title, "WilCo Badass" to officers who used physical force or violence; this practice encouraged and incentized officers to use force more frequently to be in the positive light of Chody, as those who chose their morale compass over Chody's toxic culture were met with retaliation, including termination.

29.     The excessive force culture and incentivizing of violence was prevalent under Chody with or without "LivePD" cameras present.  The following are examples of excessive force situations under Chody's leadership without "LivePD" cameras:

30.     On or around April 2019, WCSO Christopher Pisa pulled over **IMANI NEMBHARD** for a missing front license plate.  A physical altercation occurred after Pisa opened her door and exited her vehicle, as instructed.  Pisa then immediately used excessive force to shove Nembhard to the ground.  He then pressed his knee into her back and shoulder, and pressed her cheek into the asphalt.  All while her young children watched crying from the car.  Pisa was criminally indicted concerning this incident.  .In a Texas Ranger interview, Deputy Pisa reportedly admitted that he believed he would be rewarded for incidents of excessive use of force with gift cards.

31.     On or around April 2019, **SPENCER MURPHY** was involved in an excessive force incident including Williamson County Field Training Officer, Lorenzo Hernandez.  The altercation stemmed over a 911 call that Murphy made over a head injury he sustained.   When

he informed deputies who arrived at the scene that a tool malfunctioned, Hernandez and another deputy seemed to be upset with the explanation, using unnecessary force to hit Murphy in the head and slam him to the ground refusing to contact EMS for the 911 caller.  Hernandez would later be promoted to detective.

32.     On February 24, 2019, **CHARLES THORNBURG**, experienced excessive force used by Williamson County deputies during his DWI arrest.  Upon information and belief, Thornburg had tasers with bean bag rounds used on him despite complying, resulting in becoming unconscious.  While unconscious, deputies allegedly allowed K-9 units to attack Thornburg biting his penis, testacles, and stomach resulting in injuries, surgery and hospitalization.

33.     In March 2020, **JAY KREPER**, filed a lawsuit against Williamson County, TX,  claiming his hands and wrists were severely damaged because he was restrained too long for a blood test at the Williamson County Jail after he was arrested for driving while intoxicated in 2018.

### G. Policy, Practices and Customs for the production of "LivePD" within Williamson County, Texas

34.     Policing is not for show.  It is not a profession to be taken lightly.  The men and women who bravely put their lives on the line to face the daily risks for their job to serve communities are admirable, and to many, law enforcement officers are heroes, and rightly so. Policing is necessary to protect public safety and a fundamental piece of our functioning society.  When constitutional rights are blatantly ignored by law enforcement however, the law still needs to be enforced and the policies put in place that enabled such violations analyzed further, especially when law enforcement misconduct and constitutional violations result from

the partnership with a television show.

35.     "LivePD" was a reality television series produced by Big Fish Entertainment, featured on the A&E Network and broadcast nationally to millions of viewers from October 2016 to May 2020. The television program followed deputies at Williamson County Sheriff's Office simultaneously with other participating Sheriff Office's across the country and the program routinely aired encounters with civilians that were often humiliating, manufactured and/or dramatized for the purpose of increased ratings and entertainment. The program's allure to its very passionate viewership was the perception created in which each arrest that was being broadcast was happening "live" and in real-time. The program advertised itself as "unfiltered and unfettered" police work, while quite to the contrary it was not.

36.     Chody personally appeared at the Commissioners Court to advocate for the contract between Williamson County and Big Fish Entertainment and "LivePD". The contract would allow Chody and Big Fish to use county vehicles, property and facilities for the production of "LivePD."  Chody argued that the County should enter this agreement because it would help with law enforcement recruitment and outreach once the Williamson County Sheriff's Office was feature on "LivePD."

37.     In January 2018, the Commissioners Court, the governing body of Williamson County, Texas,  voted unanimously to enter into the contract with Big Fish Entertainment for the filming and production of "LivePD" within Williamson County.

38.     The contract between the County and Big Fish Entertainment called for raw video footage to be destroyed by LivePD producers within 30 days "except to the extent Producer is required to retain the Raw Footage pursuant to a valid court order or other state or federal laws.

39.     Plaintiff's criminal charges were filed on February 27, 2019, thirty-three days after the date of the arrest, allowing the destruction of raw footage from "LivePD" cameras at the

arrest to be destroyed before the charges were formally filed.  In other words, criminal charges were filed against Plaintiff after which the most conclusive evidence; the unfiltered and unfettered raw footage, was destroyed by virtue of complying with a contract signed into place by Williamson County's Commissioners Court.

40.     Law enforcement officials within Williamson County, including Robert Chody, exerted considerable influence and decision making on the program.  He  encouraged and incentivized his officers to create more entertaining television in furtherance of heightened spectacle and better television ratings.

41.     Chody's office not only reviewed recorded segments, but also permitted a representative from Chody's office to be involved in the "local control room" to review footage as it was being taped by "LivePD" cameras.

42.     "LivePD" was not actually "live" and the different policing agencies that have appeared on the television program, including the Williamson County Sheriff's Office, can selectively conceal any content they do not want aired on the program. This is not "unfiltered and unfettered" police work they advertising. In fact, it is blatant disregard to constitutional rights of those it is broadcasting and/or detaining.

43.     Dan Cesareo, the creator of LivePD, stated," The level of transparency 'LivePD' offers is unlike any other police series on television… When an officer from a participating police department gets a call, we act as a natural extension of body cams and dash cams that officers are already using, and never know what will transpire."

44.     In actuality, the television program interfered with prosecution within the Williamson County District Attorney's Office, yet continued to film and profit off the violations of residents' constitution rights and federal law. The program routinely deleted video footage

captured by producers despite knowledge that such video footage would likely be evidence in a criminal an/or civil investigation.

45.     The level of coordination between the County, Chody and "LivePD" employees surrounding the show was substantial. Given that "LivePD" production officials were permitted to use government property, hand over editorial control to Chody, and otherwise work closely with law enforcement officials for the planning, filming, and production of the show, and such an arrangement essentially made "LivePD" an extended arm of Williamson County Sheriff's Office.

46.     "LivePD" production officials and Chody acted in concert to strategize and implement law enforcement tactics in dramatic fashion for entertainment purposes. This included filming and conducting unnecessary SWAT raids on homes, using and showcasing militarized weaponry, to develop "LivePD" TV personalities". Chody had editorial control over content aired on LivePD and authority to remove a segment from being broadcast on the television program.

47.     Dispatchers were instructed by Chody and the County not to assign calls to deputies who were riding with "LivePD."  Calls were routed with "LivePD" as a priority, not public safety. These deputies were marked by a special call sign for emergency dispatchers. A Commander wrote in an internal memo, "This will let communications know that you are not to be assigned calls on a burglar alarm that had gone off."

48.     When a dispatcher accidentally dispatched a LivePD deputy to investigate a burglar alarm, Chody personally called the dispatcher's supervisor to complain adding stress to an already difficult working environment.

49.     "LivePD's" production in Williamson County led to other deputies desire to be featured on the show and a drastic increase in use of force incidents occurred with the belief

around using force would be rewarded.  Chody regularly promoted "Live PD" on social media.

He has written that the show is related to accomplishments of his office's core duties. He

regularly tweeted and otherwise promoted the show, seemingly becoming more disinterested in

his elected role as sheriff.

50.     A 2020 article by Austin-American Statesman states, "Throughout his

department's 18-month run on "LivePD," Chody often claimed the show helped build pubilc

trust in law enforcement by creating more transparency.  He routinely said it helped with

recruiting, giving deputies a chance to soak in accolades from a built-in fan base called the

LivePD Nation."

51.     Chody encouraged his deputies who were featured on the show to engage in

dangerous, high-risk police tactics, including the use of excessive force, because it would

continue to enhance his celebrity and the County's, by having entertaining appearances on

LivePD.

52.     Chody encouraged officers to use excessive force, especially for suspects on

"LivePD." The policy and culture rewarded "good TV" and it was recognized and known

amongst his staff.  Chody authorized awarding the title, "WilCo Badass" to officers who used

physical force or violence; this practice encouraged officers to use force more frequently to be in

the good graces of Chody.

53.     Chody created a culture not to de-escalate extremely serious and potentially life-

altering police interactions with the community, but instead chose to incentive excessive force,

conflict, and other constitutional rights violations.

54.     Chody's culture of indifference is further illustrated through his custom of hiring deputies with past histories of excessive violence and dishonesty.  Chody would retaliate against and punish those who did not adhere to his questionable policies, including termination.

55.     Such influence over policies, practices, and customs led to patterns of dramatic SWAT raids captured on Live PD cameras, an assaults, and a death and destroying of "LivePD" cameras and footage that were on the scene.

56.     **GARY WATSKY** filed a lawsuit against Williamson County for a SWAT raid used to arrest his son, Asher Watsky, for a filming of "LivePD."  Earlier that day, Watsky appeared in Williamson County for his criminal case.  Approximately two weeks before the raid, a warrant had been issued for Watsky's arrest.  Rather than execute the warrant, Defendant's executed the warrant in dramatic fashion with a SWAT raid for "LivePD" filming and broadcasting.

57.     On May 16, 2019, **ARCHIE SHIRLEY III** was in attendance at court for a previous misdemeanor charge.  Instead of being arrested for a new warrant while safely and peacefully in attendance at the courthouse, Williamson County Sheriff's Office deputies chose to delay his arrest  by waiting for him to return to his mother's home so that "LivePD" cameras were able to be present with a SWAT team raid at his mother's house, where she alleges a deputy pointed a gun to a ten-month old baby's head.

58.     Deputies killed **JAVIER AMBLER** for failing to dim his headlights. Javier Ambler was killed while "LivePD" cameras were present in March of 2019. Mr. Ambler died after a high speed chase due to not dimming his headlights. This minor traffic violation was turned into television spectacle though an unnecessary police chase that turned deadly after the

suspect surrendered to authorities, and despite informing them of his health conditions was repeatedly tasered and ultimately died as a result thereof. The death was not known to the public for 15 months as evidence as not made public.

59.     In November 2021, **RAMSEY MITCHELL,** settled a lawsuit with Williamson County, TX.  On June 14, 2019, Mitchell was pulled over for missing a front license plate.  The lawsuit alleges that after being pulled over, deputies issued a call to have a film crew from "LivePD" come to the encounter.  Subsequently, Mitchell was brutally assaulted by 5 deputies, two of which were involved in the Javier Ambler incident a mere 78 days before.  An internal investigation determined the use of force was justified.

60.     Williamson  County  District  Attorney  Shawn  Dick  had  concerns  with  how "LivePD"  was  operating  in  Williamson  County   Dick's  concern  stemmed  from  the  need  to preserve footage, witness contact information and the need to know whether "LivePD" had been involved in an arrest that was eventually sent to the DA's Office for prosecution

61.     "LivePD" was almost never mentioned in deputy offense reports and The District Attorney's Office was routinely made unaware of "LivePD's" involvement in a case. Dick stated, "it was like pulling teeth just to find out if something was on 'LivePD.'

62.     There is no mention of "LivePD," or a camera crew, being present in Plaintiff's police report.

63.     In June 2019, when the problem with "LivePD" reached a "boiling point," Dick emailed Chody and reiterated that videos of deputies on 'LivePD' "[is] evidence – just as the recording from a body cam or dash cam is evidence." Dick further explained that state law prohibits the destruction of evidence during an ongoing investigation.

64.     He added that his position with "LivePD" has always been that he needed to make sure his office got unaired videos from the show and of the witnesses that were on scene. "I think we need to be honest and transparent in our discovery to make sure we're turning over everything, every scrap of evidence that exists," Dick said.

65.     However, Chody and Big Fish Entertainment continued the custom of destroying, or otherwise knowingly withholding, the raw video footage.  Williamson County's Commissioner Court, failed to take any action.

66.     The District Attorney warned Chody that his office would be unable to prosecute cases when "LivePD" was involved if raw video footage was not preserved and if the DA's Office continued to be denied information about "LivePD's" involvement in an arrest.  In an interview for KVUE Mr. Dick said, "I think we need to be honest and transparent in our discovery to make sure we're turning over everything every scrap of evidence that exists."

67.     Williamson County Attorney Dee Hobbs, however, continued to prosecute misdemeanor cases involving "LivePD," enabling, or otherwise remaining silent, to the policy of destroying evidence despite the raw footage being destroyed within *thirty days* of the filming arrest.

68.     According to the Texas Association of Counties website, a county attorney in Texas has the following duties:

- Represents the state in prosecuting misdemeanor criminal cases
- Works with law enforcement officers in the investigation of criminal cases
- Provides legal advice to the Commissioners Court and to other elected officials
- Brings civil enforcement actions on behalf of the state or county

69.     Because Plaintiff's charge was a misdemeanor offense, it was not handled in Shawn Dick's District Attorneys' Office, but by Williamson County Attorney Dee Hobbs'

Office.  Hobbs viewed the raw footage, material evidence to the cases he was prosecuting, as unnecessary to preserve or acted otherwise indifferent, and knowingly allowed and participated in the destruction of material evidence within 30 days of the arrest.

70.     In August 2019 the same members of Williamson County Commissioners Court that previously unanimously voted to contract with Big Fish Entertainment and "LivePD" now voted to end filming of "LivePD" within the County. In a stunning twist, Chody ignored the County's demand and insisted he had the authority as Sheriff to continue to allow "LivePD" to film within the County.  Chody continued to allow the filming of "LivePD" within Williamson County despite the County's decision to terminate the contract with Big Fish.

71.     In May 2020, the County filed a lawsuit against Chody alleging that the County had the sole authority on decision-making regarding LivePD's presence in the County and that Chody had secretly signed a new contract with Big Fish Entertainment without the knowledge or permission of the county.  The lawsuit states "Sheriff Chody can perform the core duties of sheriff without the live TV show.  But he doesn't want to.  Instead, Sheriff Cody seeks social media and TV exposure like a moth to a light bulb – and he's flown out of his job description to get back on TV."

72.     The lawsuit further alleges that "LivePD" jeopardized the safety of the citizens of Williamson County because it prioritized television ratings over safety and proper police work." The Commissioners Court vote was 4-0 as Williamson County Judge Bill Gravell had recused himself from all matters related to "LivePD" since April 2020.

73.     At no time prior to the County's lawsuit did the County Commissioners Court move to have Chody removed from office for official misconduct despite knowledge of his ongoing policy and custom of violating constitutional rights.  By law, the Commissioners Court

has full authority on entering and terminating county contracts, according to the Texas Association of Counties.

74.     The show was canceled in June 2020, two days after the American-Statesman reported that a crew from the series was filming when Javier Ambler II died while being arrested by Williamson County. The raw footage from the "LivePD cameras recording when Ambler died in March 2019 had been destroyed.

75.     Chody and Williamson County General Counsel, Jason Nassour, were indicted in September 2020 on charges of tampering with evidence in connection with the destruction of the footage from the "Live PD" television show that filmed Ambler's death.

76.     In November 2021, Chody and Nassour were charged with additional counts of conspiracy to tamper with evidence.  The indictment alleges that they entered into a contract with the production company for "Live PD" "to destroy raw unaired audio and video footage" and that they "performed an overt act" the night of Ambler's death.

**H.  Policies, Practices and Customs of Mental Health Treatment in  Williamson County Jail**

77.     Prior to Chody's 2016 election, Williamson County had an award winning Crisis Intervention Team ("CIT").  The CIT program is a community partnership of law enforcement, mental health and addiction professionals who described the program as facilitating an innovative first-responder model of police-based crisis intervention training to help persons with mental disorders and/or addictions access medical treatment rather than place them in the criminal justice system.

78.     The program was originally created in 2005 and was recognized by the regional, state and national policing organizations as a profound success.  The program promotes officer

safety and the safety of the individual in crisis

79.     After Plaintiff filed his case, Williamson County settled a lawsuit that involved

the death of a jail inmate named **DANIEL MCCOY**, who was booked into the Williamson

County Jail on October 9, 2017, from incidents that resulted in misdemeanors that occurred at

a psychiatric hospital.

80.     According to the lawsuit filed by his mother, "This [was] a case of tragic denial

of medical and mental health care desperately needed by Daniel McCoy, a pre-trial detainee

found psychologically incompetent to stand trial. Jailers moved Mr. McCoy from a vomit-

filled cell to another cell and allowed him to die. Williamson County policies, practices, and

customs resulted in Mr. McCoy not receiving needed care.

81.     The lawsuit further alleges Williamson County allowed inmates such as Daniel

to be kept in cells and allegedly monitored such inmates through a small slot or "bean hole"

in the door and refused to provide adequate mental health care.  Specifically, the allegation

was that if Williamson County Sheriff's Deputies would have been provided medical help he

would have lived..

82.     In February 2022, Williamson County Commissioners Court approved a

$250,000 settlement from a lawsuit filed by **ELIZABETH FIREY.**  On or around September

9, 2018, Firey was allegedly in an emergency restraint chair for approximately 8 hours,  In an

article in the Austin American-Statesman, the lawsuit states "Firey suffered from mental health

issues but was not provided with mental health treatment at the jail.  It said jailers tightly

strapped her into an emergency restraint chair and left her alone in it unsupervised for hours.

Firey's lawsuit states she complained that the straps were too tight.  It said she was in pain and

strapped in a position that injured her back and that jailers did not loosen the straps.

## V.  CLAIMS

83.     Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and alleges as follows:

84.     To state a claim under Section 1983, a Plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting color of state law. *Whitley v. Hanna* (5th Cir. 2013).

85.     At all times relevant to this lawsuit, officers wore their official department uniforms and were acting under the color of State law as officers within the Williamson County Sheriff's Department.  Chody was the policymaker for all matters related to the activities of the Williamson County Sheriff's Department.  Dee Hobbs was the policy maker for all matters related to the activities of the County Attorney's Office.

86.     "[M]unicipalities and other local government units [are] included among those persons to whom § 1983 applies." *Monell v. Department of Social Services of City of New York*, 436 U.S. 3 658, 690 (1978). "It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694.61

87.     Under Section 1983, the County is liability for constitutional violations if three elements are established; (1) An official policy, practice, or custom (2) promulgated by the County's Policymaker that (3) was a moving force behind the violation of Plaintiff's constitutional rights. *Piotrowski v. City of Houston* (5th Cir. 2001)

### A.  COUNT 1, II  -  FOURTEENTH AMENDMENT *MONELL* § 1983 EXCESSIVE FORCE

88.     Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and alleges as follows:

89.     The conduct described in this Count constitutes excessive force in violation of the United States Constitution, as incorporated by the Fourteenth Amendment. Established by *Kingsley v. Hendrickson* (2015), pretrial detainees have a constitutional right under the Fourteenth Amendment's Due Process Clause to be free from the use of excessive force.

90.     Williamson County ratified or had in existence the following policies, practices and customs in place:

- Use of restraint;
- Routine use of the emergency restraint chair in situations where it is not necessary;
- Using the emergency restraint chair to punish, as an alternative to treating detainees suffering from mental health conditions;
- Encouraging and incentivizing physical conflict and use of restraint chair rather than de-escalation;

91.     Chody was aware of these policies and practices around excessive use of force including using emergency restraint chairs.  Chody's inadequate policies surrounding the use of restraint chairs was inadequate .  It was apparent that these policies enacted obvious risks to constitutional violations.  Alternatively, restraint chairs should never be used for pretrial detainee punishment.

92.     The restraint chair policy articulated herein was actually known, constructively known or otherwise acknowledged and/or ratified by Williamson County.  Its chief policy maker for the Sheriff's department was Robert Chody.  These policies were practiced with deliberate indifference to Plaintiff's constitutional rights, and the force used against Plaintiff was objectively unreasonable.

93.     Chody was deliberately indifferent to the known and obvious consequences of these policies and practices concerning the use of the restraint chair.  He encouraged these

excessive force and use of restraint practices.  Williamson County was aware of, authorized and enabled these policies at the time of Plaintiff's injuries.  Chody was aware of the facts from which any reasonable policy maker could draw the inference that a substantial risk of serious liability existed, and would remain unless there was a change to policy, specifically a restraint chair should not be used to punish a pretrial detainee as a necessary policy change. The restraint chair policies were promulgated by Defendant and were a moving force behind the Plaintiff's excessive force constitutional violations and subsequent physical and mental injuries that were incurred and remain.  Plaintiff requests all compensatory and punitive damages he may be entitled.

94.      Furthermore, Plaintiff claims Due Process Clause during interactions with Lt. Grayson Kennedy.  Lt. Kennedy, acting under color of state law, detained Plaintiff for longer than necessary simply to film footage for a television show. Chody, a chief policy maker, was aware of these practices.  Plaintiff could have been simply put in the back of a police cruiser and transported to the Jail but prioritized filming at Plaintiff's expense.  This policy of prioritizing filming at the expense of prolonged and drawn out arrests to create entertainment was promulgated by Defendant and a moving force behind Plaintiff's Fourteenth Amendment Due Process Clause violations.

95.      The force used before being transported to pin Plaintiff against the side of the cruiser constitutes violations of the Fourth Amendment, incorporated through the Fourteenth Amendment.  Kennedy, acting under color of state law,  acted objectively unreasonable by pushing Plaintiff against the cruiser after he asked for his name.  Chody, a chief policy maker, was aware of the policies surrounding provoking arrestees and excessive force.  Any reasonable policy maker would conclude that the policies in place on the night of Plaintiff's arrest in which to escalate conflict for television purposes puts the municipality in tremendous

risk of constitutional violations and failing to take corrective action would predictably result in more constitutional violations.  Defendant promulgated these policies  for "LivePD" policies and was a driving force behind Plaintiff's Fourth Amendment violation.  A proof-of-pattern is supported by the highly predictable continued constitutional violations that remained.

## B.  COUNT III  -  EIGHTH AMENDMENT *MONELL*  § 1983
## CRUEL AND UNUSUAL PUNISHMENT

96.     Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and alleges as follows:

97.     In the alternative, without waiving any of the other claims pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Williamson County is liable to Plaintiff pursuant to § 1983

98.     The conduct described in this Count constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment.

99.     The policies, practices and customs promulgated by Defendant:

- Emergency dispatchers routing calls according to an officer's "LivePD" status and rank;
- Capitalizing on exploiting serious criminal justice matters for television spectacle;
- Provoking, humiliating, or generally allowing cameras to be present for entertainment and/or ratings purposes at expense of arrestees constitutional rights;
- Permitting the editing of recorded segments being presented to the public as "unfiltered" and "live" when it is not;

100.     The policies, practices and customs of Defendant were used maliciously and

sadistically for the purpose of inflicting Plaintiff mental and emotional harm.  Facilitating
"LivePD" cameras to be present during arrest and encouraging the escalation of conflict were
practices that one could reasonably expect would result in more arrestees experiencing higher
levels of anxiety, or more prone to a mental episode.  Defendant failed to provide medical care
when a manic episode was open and obvious, and was highly predictable given the practice of
escalating conflict and Plaintiff's disclosed mental health history and ADA protections.  Policy
changes to ensure federal laws such as ADA were being followed would have been a better
policy.

101.    The practices surrounding exploiting pretrial detainees by broadcasting edited
portions of their arrest was a driving force behind Plaintiff's Cruel and Unusual Punishment
constitutional violations.

102.    The policies and practices of broadcasting pretrial detainees edited arrests and
exploiting those suffering from mental health symptoms was a policy promulgated by
Defendant and a was moving force behind the Plaintiff's cruel and unusual punishment
constitutional violations and mental injuries that were incurred as a result and persist.  Plaintiff
requests all compensatory and punitive damages he may be entitled.

## C.  CLAIM IV FOURTEENTH AMENDMENT *MONELL*  §  1983 FAILURE TO
## PROVIDE MEDICAL CARE,

103.    Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and
alleges as follows:

104.    In the alternative, without waiving any of the other claims pled herein, without
waiving any procedural, contractual, statutory, or common-law right, and incorporating all other
allegations herein (including all allegations in the "Factual Allegations" section above) to the

extent they are not inconsistent with the cause of action pled here, Williamson County is liable to Plaintiff pursuant to § 1983 FAILURE TO PROVIDE MEDICAL CARE

105.    The policy of using the restraint chair as punishment for pretrial detainees experiencing mental health symptoms was policy promulgated by Defendant.  Williamson County enacted and/or ratified the policies, procedures and customs around the restraint chair resulting in the predictable outcome of pretrial detainees with mental health conditions failure to get medical treatment when required.  Using the restraint chair as punishment on pretrial detainees who have pre-existing mental health conditions was a moving force behind Plaintiff's *Monell Claim* and constitutional violations of § 1983 through the Fourteenth Amendment, failure to provide medical care.  Plaintiff requests all compensatory and punitive damages he may be entitled.

## D.  CLAIM V TITLE II OF THE AMERICANS WITH DISABILITIES ACT REHABILITATION ACT § 504

106.    Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and alleges as follows:

107.    In the alternative, without waiving any of the other claims pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Williamson County is liable to Plaintiff pursuant to the Americans with Disabilities Act ("ADA") and federal Rehabilitation Act.

108.    Williamson County has been and is, a recipient of federal funds, and thus

covered by the mandate of the Rehabilitation Act.  The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities and services and reasonably modify such facilities, services and programs to accomplish this purpose. 29 U.S.C. § 794 (2008)

109.    Under Title II of the ADA, which has the same mandate as Section 504 the Rehabilitation Act, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132 et seq.

110.    The Williamson County jail is a "facility" for purposes of both the Rehabilitation and ADA.  Additionally, the jail's operation comprises a program and services for Rehabilitation Act and ADA purposes.  Jails also provide services like medical and mental health care to detainees like Plaintiff.

111.    To state a claim under Title II, a plaintiff must allege that (1) he has a qualifying disability; (2) he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) such discrimination is due to his disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

112.    Plaintiff is a qualified individual for purposes of the Rehabilitation Act and ADA, having a mental impairment or medical condition that substantially limited one or more of his major life activities.  In this case, the operation of his brain, and substantial limitations on his ability to think, concentrate, eat, breath and care for himself, due to anxiety disorder, and post-traumatic stress disorder.

113.    At the time of the events herein, Williamson County had the following policies

and practices:

- Using the emergency restraint chair as an alternative to mental health treatment
- Using the emergency restraint chair against manufacturers best practices
- Denying adequate mental health and medical care to detainees
- Underfunding medical and mental health care at the jail
- Culture of treating scenarios for de-escalation with domination, force and punishment
- Failing to make accommodations for pretrial detainees suffering mental health episodes
- Disbandement on Crisis Intervention Team ("CIT")
- Failing to train staff on how to identify and treat mental health symptoms and crisis.

114.    Additionally, Plaintiff was denied benefits under ADA and Rehabilitation Act.

Necessary accommodation were so open and obvious that a request was unwarranted for the

following reasons:

- Plaintiff disclosed mental health history with staff and details qualifying Plaintiff as covered by ADA, and Rehabilitation Act.
- Plaintiff disclosed that his symptoms were already inflamed;
- Plaintiff was exploited for that night's television show without his consent compounding mental health symptoms he was already experiencing.
- Plaintiff's symptoms were predictable.

115.    The County and its jail staff should have accommodated Plaintiff by:

- Providing adequate mental health care during Plaintiff's incarceration
- Not using force and restraint to meet predictable increases in mental health symptoms or crises;
- Not using restraint more than needed, if restraint was necessary, which in this case it was not;

116.    Failure to provide these reasonable accommodations was intentional

discrimination under the ADA and Rehabilitation Act.  Chody encouraged the use of restraint

chairs and thus, failed to supervise his officers to ensure they would provide mental health and

medical care. Defendant was aware of the risks that were present with the policies, practices,

and customs and highly predictable outcome of Plaintiff's injuries, but acted with deliberate

indifference.  It was open and obvious, or should have been open and obvious with proper training, that using a restraint chair under those circumstances poised a significant risk.

117.    This policy and practice of the restraint chair is illegal discrimination under the Americans with Disabilities Act (1990) and Rehabilitation Act (1973).  Furthermore, Williamson County's violations of the ADA and Rehabilitation Act include the failure to reasonably modify facilities, services, and programs to reasonably accommodate Plaintiff's qualifying disability.  Elizabeth Firey and Daniel McCoy's incidents and subsequent lawsuits show a proof-of-pattern of Defendant acted with deliberate indifference discriminating against providing mental health symptoms for its detainees with mental health conditions.

### E.  CLAIM  VI – FOURTEENTH AMENDMENT *MONELL*  § 1983 DUE PROCESS CLAUSE BRADY VIOLATION *BRADY v. MARYLAND (1963)*

### CLAIM VII - SIXTH AMENDMENT *MONELL* § 1983 RIGHT TO SPEEDY TRIAL

118.    Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and alleges as follows:

119.    In the alternative, without waiving any of the other claims pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Williamson County is liable to Plaintiff pursuant § 1983 DUE PROCESS CLAUSE AND SIXTH AMENDMENT VIOLATIONS RIGHT TO SPEEDY TRIAL.

120.    The conduct described in these Counts constitutes violations of the Due Process Clause and Right to Speedy Trial protected by the Sixth Amendment of the United States

Constitution, as incorporated by the Fourteenth Amendment.  The Due Process

Clause guarantees "due process of law" before the government may deprive someone of "life,

liberty, or property."

121.    In *Brady v. Maryland* (1963), the United States Supreme Court ruled that the

government's withholding of evidence that is material to the determination of either guilt or

punishment of a criminal defendant violates the defendant's constitutional right to due process.

122.    There are three components of a true Brady violation: (1)The evidence at issue

must be favorable to the accused; (2) that evidence must have been suppressed by the State,

either willfully or inadvertently; and (3) prejudice must have ensued.

123.    In Plaintiff's first internal investigation complaint alleging misconduct; he

claimed Lt. Grayson Kennedy's conduct as "instigating", and noted the presence of "LivePD"

cameras.  At this point, Plaintiff assumed incorrectly that the "LivePD" footage would have,

and was at that point, preserved.

124.    *Brady v. Maryland* specifically  rules, "The government's withholding of

evidence that is material to the determination of either guilt or punishment of a criminal

defendant violates the defendant's constitutional right to due process.  In this situation, all

evidence, including the raw footage of "LivePD" cameras should have been preserved to avoid

violating the *Due Process Clause* of the Fourteenth Amendment.

125.    When Plaintiff submitted his first internal complaint on or around March 3,

2019, more than 30 days had passed since the date of arrest.  This meant the raw footage from

"LivePD" cameras would already be destroyed, unless otherwise requested.  The request to

obtain this material evidence would have come from Defendant, but was deliberately

indifferent to *Due Process Clause* violations..

126.     The raw footage was requested by attorneys of Plaintiff within the criminal case proceedings.  It was determined by prosecutors that raw footage no longer existed.  It is reasonable to assume the raw footage from "LivePD" cameras had been destroyed within 30 days of the arrest or were being withheld, violating the Fourteenth Amendment Due Process Clause.

127.     Plaintiff found several months after the arrest that there was not any mention of "LivePD" in the police report from the night of the arrest.  The contract stipulated that unaired raw footage to "be destroyed by [Big Fish] no later than thirty (30) days after the Raw Footage is captured, except to the extent [Big Fish] is required to retain the Raw Footage pursuant to a valid court order or other state or federal laws."  That federal law would be *Brady v. Maryland*.

128.     Defendants policies gave "LivePD" access to its facilities to monetize off the manipulated and edited arrests within its County; which it sold to viewers as "live" when it was not.  The County had the responsibility to ensure Brady Violations did not occur. There is no evidence that Dee Hobbs' County Attorney Office made any concerted effort in retaining any of the unaired raw footage of the "LivePD" cases his office was prosecuted.  Regardless of the County Attorney's intent, *Brady* rules "that evidence must have been suppressed by the State, either willfully or inadvertently."

129.     Defendant had actually known, constructively known or otherwise acknowledged and/or ratified the policy of destroying raw evidence from "LivePD" cameras.  Dee Hobbs, acting under color of state law, was deliberately indifferent to protecting the "life, liberty and property" of those featured on the television show and the risk of continued constitutional violations stemming from policies of his office.

130.    Plaintiff was prejudiced by the failure to preserve all material evidence constituting a Brady violation and constitutional violation under the Fourteenth Amendment. Although Plaintiff's case was ultimately dismissed by the State of Texas for insufficient evidence during Jury Trial, the misdemeanor case took over three years to conclude, with the Brady Violation prejudicing Plaintiff's defense greatly during proceedings.

131.    Material evidence was withheld or allowed to be knowingly destroyed, without any action being taken by the office prosecuting his case, a policy promulgated by Defendant. It was highly predictable consequence that this policy of willfully destroying evidence, mixed with the practice of officers failing to mention "LivePD" in police reports would lead to an increase in prosecutorial misconduct and constitutional violations.

132.    Dee Hobbs, a policy maker, for Williamson County Attorney's Office, acting under color of state law knowingly prosecuted Plaintiff's case for 3 years and 3 months, 1,186 days to be exact, despite knowing, or the position to should have known, material evidence was destroyed and/or missing from Plaintiffs misdemeanor case file and subsequent internal complaints.

133.    The willful permitting by Defendant to allow destruction of material evidence from arrests was promulgated by Defendant and was a moving force behind the *Brady Rule* violations Plaintiff incurred protected by the Fourteenth Amendment's *Due Process Clause*. All material evidence relating to guilt or punishment should have been retained as an alternative to avoid any Brady Violations, prosecutorial misconduct or avoid other constitutional violations.

134.    In addition, the policy of continuing to prosecute criminal cases in the County Attorneys' Office despite knowledge material evidence was missing by virtue of a contract signed with "LivePD' was promulgated by Defendant and a moving force behind violations to

Plaintiff's Sixth Amendment  Right to Speedy Trial.  Plaintiff was subject to emotional distress, and financial loss due to unconstitutional unnecessary delay in proceedings,  Plaintiff requests all compensatory and punitive damages he may be entitled.

## F.  CLAIM VIII  FOURTEENTH AMENDMENT *MONELL* §  1983 HIGH SPEED CHASE

135.    Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and alleges as follows:

136.    In the alternative, without waiving any of the other claims pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Williamson County is liable to Plaintiff pursuant §  1983.

137.    The conduct described in these Count constitutes violations of the Fourteenth Amendment.  The policies, practices, and customs promulgated by Defendant regarding high speed chase policies was a moving force behind Plaintiff's constitutional violations.

138.    Plaintiff's arrest was carefully selected, edited, and then broadcast as the opening scene of that night's "LivePD" episode, with nearly two million watching what they perceived the show to be "unfettered and unfiltered" police work they were watching "live.".  Dan Abrams, the host of the program begins the episode with cameras at Plaintiff's arrest stating, "we are live in Williamson County, Texas, where a DUI test is underway on a man who officers say was driving over 70 MPH through a residential neighborhood."

139.    At no point during the nearly five minute opening scene of the episode is there mention to the audience that the traffic stop and field sobriety test were initiated by a civilian following Plaintiff for nearly twenty minutes, giving the audience misleading context into the

circumstances that preceded.

140.    Policies, practices, and customs were implemented tasking dispatchers with special assignment to route certain calls to "LivePD" deputies allowed officials to make dispatching decisions based off the probability of entertaining arrests for the television show, while disregarding public safety.  Having special dispatch assignments for "LivePD" deputies puts public safety at jeopardy  by delaying response, and creating a stressful working environment for its dispatchers.

141.    Plaintiff was parked for several minutes while civilian was on the phone with dispatch.  Eventually a chase ensues involving the civilian vehicle and Plaintiff after approximately ten minutes.  Audio recordings confirm while the dispatcher is still seemingly working on routing the call, Plaintiff accelerated and dispatch encourages the civilian to continue to follow knowing speeds are increasing, effectively enabling the civilian to pursue a high speed chase.  When police lights were spotted, plaintiff pulled over and was subsequently detained to perform a field sobriety test after being transported to a different location.

142.    Javier Ambler's death was initated by a high speed chase after reportedly failing to dim his headlights and "LivePD" involvement.  The twenty-two minute chase, for a reportedly minor infraction, supposedly had minor off-road collisions before a final crash, and being tasered to death.  Javier Ambler plead with officers that  he could not breathe, and that he had congestive heart failure.  While the body cams and dash cams clearly show the excessive use of force exhibited on Mr. Ambler after the crash; the available video surrounding the twenty-two minutes that led up to the high speed chase and multiple reported traffic incidents, are much less clear.

143.    In November 2021, Chody and Nassour face additional charges of conspiracy to tamper with evidence.  The indictment alleges that they entered into a contract with the

production company for "Live PD" "to destroy raw unaired audio and video footage" and that they "performed an overt act" the night of Ambler's death.

144.    Plaintiff filed a complaint regarding his "LivePD" arrest which was initiated with a  high speed chase and a civilian enabled by Williamson County dispatchers approximately three weeks before Javier Ambler's death.  If Plaintiff's original complaint was properly investigated, any reasonable policymaker would have concluded that a substantial risk existed and a proper investigation into policies resulting in constitutional violations would be corrected to avoid a disastrous situation, such as Javier Ambler due to such reckless policy.  Instead, Plaintiff's complaint went missing and the consequences of such policies in place were a driving force of the public safety policies that were in place at Plaintiff's arrest and continued during Javier Ambler's death

145.    The practice of encouraging a civilian to engage in high speed chases for minor traffic violations was a driving force behind Plaintiff's Fourteenth Amendment § 1983 violation regarding high speed chases.  Chody as chief policy maker of the Sheriff's office enacted and encouraged these policies, practices, and customs.  Defendant, knew or should have known, the risks involved with recklessly advise civilians to chase.  Policies in place to prioritize public safety rather than a television show is a better alternative that a reasonable policy maker would conclude.  Policies that were in place encouraged escalation of conflict, and high risk scenarios such as high speed chases for the potential to make entertaining television despite any carnage it produced.  Williamson County known, constructively known or otherwise acknowledged these policies existed and acted deliberately indifferent to the extreme risks that existed.   Although Plaintiff did not crash his vehicle, the potential for loss of "life, liberty, and property" protected by the Fourteenth Amendment was substantial and caused by policies allowing civilians to participate in chases.  The deliberate indifference is supported by an internal complaint submitted

by Plaintiff three weeks before Javier Ambler's death that should have given notice that policies

were inadequate and dangerous.  Chody showed deliberate indifference by allowing deputies, or

whomever following Mr. Ambler, to engage in a high speed chase that ended catastrophically.

The policy surrounding engaging in high speed chases was a driving force in Plaintiff's

constitutional right violation.

### G.  *MONELL CLAIMS* §  1983 FAILURE TO TRAIN AND FAILURE TO SUPERVISE

146.    Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and

alleges as follows:

147.     In the alternative, without waiving any of the other claims pled herein, without

waiving any procedural, contractual, statutory, or common-law right, and incorporating all

other allegations herein (including all allegations in the "Factual Allegations" section above) to

the extent they are not inconsistent with the cause of action pled here, Williamson County is

liable to Plaintiff pursuant §  1983 Failure to Train and Supervise causing Plaintiff's numerous

constitutional violations.

### 1.  FAILURE TO TRAIN  §  1983 EXCESSIVE FORCE; RESTRAINT CHAIR FAILURE TO SUPERVISE  §  1983 EXCESSIVE FORCE; RESTRAINT CHAIR

148.    Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and

alleges as follows:

149.    Defendant's inadequate training policies around the use of the restraint caused

was inadequate and a moving force in Plaintiff's Excessive Force constitutional violation; and

failure to supervise surrounding excessive force and use of restraint chair was a cause in

Plaintiff's Section 1983 excessive force constitutional violations.  Williamson County could

have taken disciplinary action on Chody and his policies but did not, thus failing to supervise

it's Sheriff's Office. Defendant had known, or should have known, the obvious consequences and risks to Plaintiff and acted deliberately indifferent.  Having de-escalation procedures in place was a better alternative than incentivizing excessive force, and use of restraint. The policies were adopted by chief policy makers and/or continued with deliberate indifference to the constitutional violations they would cause to Plaintiff and others, or likely continue to cause.  Chody's failure to address inadequate training policies regarding how to properly use the restraint chair caused Plaintiff's constitutional violation.  Failure to correct prior deficiencies in its use of restraint chair policies caused an increased probability more constitutional rights would be violated, such as Plaintiff's.  Williamson County was deliberately indifferent to such risks. Plaintiff requests all compensatory and punitive damages he may be entitled.

## 2.  FAILURE TO TRAIN § 1983 CRUEL AND UNUSUAL PUNISHMENT; "LIVEPD" POLICIES
## FAILURE TO SUPERVISE § 1983 CRUEL AND UNUSUAL PUNISHMENT;

150.    Defendant's inadequate training policies surrounding the production of "LivePD" was inadequate and a moving force in Plaintiff's Section 1983 Eighth Amendment Cruel and Unusual Punishment violations.  Chody, a chief policy maker, was deliberately indifferent to the risks the inadequate policies presented.  Defendant's training policies were inadequate because pretrial detainees are free from punishment, let alone cruel and unusual punishment.  These policies were enacted by the County and Robert Chody, chief policy makers for the County. The custom of broadcasting edited portions of an arrestee without consent while in pre-trial detainment caused Plaintiff's debilitating inflammation of mental health conditions and constitutional violations.  Defendant had known, or should have known, the obvious consequences and risks by promulgating and maintaining such policy.  A better

alternative would be to not intentionally inflame pretrial detainees mental health symptoms by inflicting cruel and unusual punishment by broadcasting and exploiting an individuals for the production of a television show.  Williamson County was aware of these inadequate policies but did not take action until it was too late.  Defendant was deliberately indifferent supported by proof-of-pattern of humiliating or dramatizing arrests for "LivePD" purposes at the expense of constitutional violations such as the examples provided by Javier Ambler, Ramsey Mitchel, Archie Shirley III, and Gary Watsky.  The County enabled Chody for too long, thus failing to supervise.  The  policies enacted by the Commissioners Court to allow Chody to enact such policies for "LivePD" allowed Chody to enact policies to violate Plaintiff's constitutional rights. Plaintiff requests all compensatory and punitive damages he may be entitled.

**3.      FAILURE TO TRAIN §  1983 FAILURE TO PROVIDE MEDICAL CARE
         FAILURE TO SUPERVISE §  1983 FAILURE TO PROVIDE MEDICAL CARE**

151.    Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and alleges as follows:

152.    Defendant's training policies surrounding identify and treating mental health symptoms and/or crises was inadequate and a moving force in Plaintiff's Section 1983 Failure to Provide Medical Care.  The policies were adopted or continued by Chody with deliberate indifference to the constitutional violations they could potentially cause to others.  Defendant had known, or should have known, the obvious consequences and risks by promulgating and maintaining such policy.   Defendant previously had the "CIT", or Crisis Intervention Team, in place to use de-escalation tactics and services for pretrial detainees, a better alternative than the policies of treating mental health symptoms with force, negligence, and/or restraint.  If Defendant had proper de-escalation tactics in place, physical injury to Plaintiff would have

been extremely less likely to occur. Chody's negligence to educating, identifying, and treating mental health conditions was a driving force to violating Plaintiff's constitutional right. Williamson County could have taken action but did not, thus failing to supervise. Chody was acting as policy maker for Williamson County. Defendant was deliberately indifferent supported by proof-of-pattern with facts of Daniel Mccoy and Elizabeth Firey. Plaintiff requests all compensatory and punitive damages he may be entitled.

### 4.  FAILURE TO TRAIN §  1983 HIGH SPEED CHASE
### FAILURE TO SUPERVISE §  1983 HIGH SPEED CHASE

153.    Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and alleges as follows:

154.    Defendant's training policies surrounding enabling dispatch to instruct civilians to ensue in high speed chases was inadequate and was a moving force in Plaintiff's Section 1983 High Speed Chase claim. Defendant had known, or should have known, the obvious consequences and risks by promulgating and maintaining such policy. Chody, policy maker, enacted such policies. The policies were adopted or continued with deliberate indifference to the constitutional violations they would cause to others. Defendant was deliberately indifferent supported by proof-of-pattern established by the extremely unfortunate consequences of Javier Ambler's incident and death initiated, allegedly by a high speed chase. Williamson County officials should have known that a substantial risk existed if they took Plaintiff's first initial complaint and investigated seriously the weeks prior to Mr. Ambler's death, thus failing to supervise. The failure to supervise, or otherwise correct deficient policies around engaging civilian, or otherwise enabling in high speed chases lead to constitutional violations. Plaintiff requests all compensatory and punitive damages he may be entitled.

**5.  FAILURE TO TRAIN §  1983 BRADY VIOLATION**
**FAILURE TO SUPERVISE §  1983 BRADY VIOLATION**

155.    Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and alleges as follows:

156.    Defendant's training policies surrounding the retention of material evidence was inadequate and a moving force in Plaintiff's Section 1983 Due Process Clause Brady Violation Claim.  While County Attorney Shawn Dick was vocal about the importance of retaining the evidence captured by "LivePD" cameras, County Attorney Dee Hobbs did not seemingly find this evidence important.  Hobbs was deliberately indifferent to material evidence missing from cases his office was prosecuting, including Plaintiff's.  Dee Hobbs is a chief policy maker for Williamson County Attorney's Office.

157.    Because Hobbs did not offer Williamson County deputies or his staff any training or additional procedures on how to avoid Brady violations or other constitutional violations, or otherwise take reasonable steps to avoid a Brady violation the single-exception use for deliberate indifferent applies here.  Hobbs should have taken reasonable steps to ensure all material evidence was available for the cases his office was prosecuting to avoid the predictable outcome of Plaintiff's constitutional violation.  The constitutional violation risk from such policy was open and obvious if deputies continued to leave the fact that "LivePD" cameras were present at an arrest out of the police report.

158.    Defendant had known, or should have known, the obvious consequences and risks by promulgating and maintaining such policy but did not take action, thus failing to supervise. The policies were adopted or continued with deliberate indifference to the constitutional violations they would cause to Plaintiff and others.  The failure to train officers to include "LivePD" in police reports caused material evidence to be destroyed and the

likeliness of constituonal rights violations to increase.  A better policy was the District Attorneys, who flatly required the retention of all material evidence available in order to prosecute the case.  This practice mitigates constitutional violations from Brady Violations. Defendant's failed to supervise the practice of  deputies leaving mention of  "LivePD" out of police reports, or any prosecutorial misconduct as a result of such policy by chief policy makers.  While Defendant knew of the material evidence destruction policies regarding "LivePD", it did not properly supervise the Offices exploiting such a contract causing Plaintiff's constitutional violations.  Defendant was deliberately indifferent to the 3 year and 3 month prosecution without material evidence caused by such deliberate indifferent. Plaintiff requests all compensatory and punitive damages he may be entitled.

### 6.  FAILURE TO TRAIN  §  1983 EXCESSIVE FORCE
### FAILURE TO SUPERVISE  §  1983 EXCESSIVE FORCE

159.    Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and alleges as follows:

160.    The policy of using "LivePD" for entertainment purposes in Williamson County was inadequate and a moving force in Plaintiff's Excessive Force violation.  Chody, policy maker, for the Sheriff's Office acted deliberately indifferent to the risks these policies presented.

161.    Williamson County had the chance to take corrective action but it did not, thus failing to supervise.  When entering into a partnership with the Sheriff's Office and a television show, it is reasonable to take the necessary steps to ensure constituonal violations were not being violated, yet Defendant did not.  By proof-of-pattern, Williamson County was deliberately indifferent to the constitutional violations suffered by Plaintiff and others. Plaintiff requests all compensatory and punitive damages he may be entitled.

7.  **FAILURE TO TRAIN §  1983 DUE PROCESS CLAUSE**
    **FAILURE TO SUPERVISE §  1983 DUE PROCESS**

162.   Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and alleges as follows:

163.   The policy of prolonging transporting an arrestee to the jail to film for "LivePD" caused Plaintiff's Fourteenth Amendment Due Process Clause violation.

164.   The practice of prolonging an arrest for the purposing of filming a television show was inadequate and a moving force behind Plaintiff's constitutional rights.  Chody as chief policy maker for the Sheriff's Office promulgated such policy, and thus Defendant failed to supervise.  Prolonging a police interaction in order to film a show instead of safely transporting arrestees efficiently to the Jail is a tremendous risk for constitutional violations.

165.   Williamson County had the chance to take corrective action but it did not, thus failing to supervise.  When entering into a partnership with the Sheriff's Office and a television show, it is reasonable to take the necessary steps to ensure constitunal violations were not being violated, yet Defendant did not.  Defendant acted with deliberate indifference to Plaintiff's Due Process Clause violation by prolonging his arrest to film.  Plaintiff requests all compensatory and punitive damages he may be entitled.

**H.  IN THE ALTERNATIVE, TEXAS TORT CLAIMS ACT NEGLIGENCE**

166.   Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein and alleges as follows:

167.   In the alternative, without waiving any of the other claims pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the

extent they are not inconsistent with the cause of action pled here, Williamson County is liable to Plaintiff pursuant to TEXAS TORT CLAIMS ACT NEGLIGENCE.

168.    Defendant Williamson County is a governmental unit subject to the Texas Tort Claims Act, Texas Civil Practice and Remedies Code § 101.021.  Williamson County possessed, controlled, or otherwise owned the emergency restraint chair.

169.    Defendant used tangible personal property, the emergency  restraint chair, on Plaintiff negligently resulting in persisting physical and mental injuries.

170.    The jailers and other relevant staff were employees of Williamson County and acted in the course of their employment at all relevant times.

171.    Williamson County's responsible for injuries incurred to Plaintiff from engaging in dangerous use of the emergency restraint chair.  Defendant had actual knowledge, or should have known, that the chair posed a danger to Plaintiff and other detainees.

172.    If Williamson County were a private person, it would be liable as a private entity for premises liability and/or negligence relating to its' employees' negligence to the dangers and risk of using the restraint char.

173.    Plaintiff provided written notice to Williamson County of her claims as required by the Texas Tort Claims Act.  Plaintiff's claim were  open and obvious to Williamson County Jail Staff.

## VI. DAMAGES

174.    Plaintiff suffered and claims the following damages:

**1.  ACTUAL DAMAGES**

- Past and future physical pain and suffering

- Past and future mental anguish

- Past and future disfigurement

- Past and future impairment

- Past and future medical expenses

- Past and future loss of earning capacity

**Punitive or exemplary damages** are recoverable under Section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Here, the conduct of the Defendant's and it's chief policy makers, specifically Robert Chody and Dee Hobbs, have been indifferent to the reckless nature of their policies and callously indifferent to the federally protected rights they took an oath to protect.  This was all for the purpose of a edited and manuipulated television show where constitutional violations were torn to shreds for the purposes of ratings, quest for fame, and entertainment.  Law enforcement should never be law entertainment.  Television and policing just do not mix.  Evil motives can show, which is what happened in this case.  The core duties of law enforcement were ignored at Williamson County Sheriff's Office for a television show; featuring a sheriff implementing unconstituonal and reckless policies that have uprooted the lives of many, and even ended at least one.  The evil motives and reckless policies that caused Plaintiff's constitutional violations have had lasting impact.  As such, Plaintiff requests punitive and exemplary damages to greatly deter this type of misconduct in the future and ensure law enforcement agencies are always focused on enforcing the law.

## VII. JURY DEMAND

175.     Plaintiff respectfully requests jury trial pursuant to FED. R. CIV. P. 48.

## VIII. PRAYER FOR RELIEF

176.     Accordingly, Plaintiff asks that judgement be awarded against Defendant for:

        (1) Compensatory damages;

        (2) Punitive or exemplary damages;

        (3) Costs of court;

        (4) Pre-judgement and post-judgment interest at the highest rate allowable under the law;

        (5) Plaintiff seeks unliquidated damages in an amount that is within the jurisdictional limits of the court; and

        (6) All other relief to which Plaintiff is justly entitled.

RESPECTFULLY SUBMITTED,

.

By: /s/Scott Phillip Lewis
  Scott Phillip Lewis
  64 Mckinley St.
  Lake Placid, NY 12946
  scottphilliplewis@gmail.com

## CERTIFICATE OF SERVICE

On this 17th day of August, 2022, a true and correct copy of the foregoing was served on the following attorney in charge for Defendant, via electronic service:

Ben Zinnecker                               /s/Scott Phillip Lewis
Germer Beamen and Brown PLLC           64 Mckinley St. Apt 2
1501 South Mopac Expy, Sute A400        Lake Placid, NY 12946
Austin, Texas 78746                       (518) 416-3354
(512) 472-0288                           scottphilliplewis@gmail.com
Bzinnecker@germer-austin.com